*114 TEXTO COMPLETO DE LA SENTENCIA
Ante nos comparece la parte apelante, Manuel García Colón, en ánimo de solicitar la revocación de una sentencia dictada el 20 de enero de 2004 por el Tribunal de Primera Instancia, Sala Superior de Caguas (en adelante, “TPF). Mediante la misma se declara no ha lugar la causa de acción sobre hostigamiento sexual y discrimen por razón de sexo en su vertiente de represalia instada por el apelante contra la corporación Cellular One de Puerto Rico (en adelante, “Cellular One’’’), Carmen Cruz, David Guerra, Madeline Cuesta y Carmen Cuevas. El TPI concluyó que existía controversia de hechos sobre el ambiente de trabajo que alegadamente prevalecía en Cellular One, incluyendo el hecho de si la privación de oportunidades de ascensos fue motivada por razones discriminatorias.
Se confirma la sentencia apelada.
I
Manuel García Colón comenzó a trabajar para Cellular One desde el 23 de noviembre de 1993 hasta que el 11 de octubre de 2000 presentó su renuncia. Al servicio de Cellular One, el señor García ocupó diversos puestos en calidad de técnico y estuvo también en varias facilidades de la empresa en distintas localizaciones. Para septiembre de 1997 fue ascendido a Supervisor de Servicios Técnicos en las facilidades de Caguas y tenía a su cargo la supervisión de varios técnicos de servicios. Allí, Cellular One tenía asignada a Madeline Cuesta *115 como supervisora del área de servicios al cliente y a Carmen Cuevas como gerente de la oficina.
El señor García es descrito como poseedor de un carácter jovial, muy propenso a los comentarios ligeros y la broma. En su tiempo libre se dedica a servir de “D.J.” y a ejecutar rutinas de comedia. Delante de los técnicos y el personal actuaba como amanerado a tono de broma.
En ocasiones, García le pedía a la compañera supervisora Cuesta que modelara cuando la veía llegar, lo cual le solicitaba frente a los técnicos, según él, para disfrutar de su belleza. En su interacción con sus compañeros gustaba imitar el acento y expresiones de algunos clientes cuando éstos se habían marchado. De los documentos se desprende que ello lo hacía a modo sana diversión. Pero también era común que efectuase comentarios subidos de tono frente a los compañeros de la gerencia. Así, en una ocasión en que Cuesta llegó a las facilidades y comentó que el lugar apestaba a huevo, él le replicó, “claro habiendo tantos hombres aquf’.
En otra instancia, mientras Carmen Cuevas y Madeline Cuesta escuchaban un programa de radio, García le ofreció el comentario de que cuando su hijita era pequeña la bañaba y le lavaba el clitoris. En otra ocasión, al preguntar la apelada sobre el por qué venía con las cejas afeitadas, él contestó que obedecía a una fantasía sexual de su esposa y por ello se afeitaba todo el vello del cuerpo. Además, los documentos sugieren que la ligereza y el tono del ambiente laboral de los dos supervisores incluyendo a García Colón quedaron patentes cuando le celebraron una despedida de soltero al técnico Javier Pacheco. Los dos recogieron dinero para comprar una canasta y acudieron a la tienda especializada “Picardía”, y compraron productos denominados Kama Sutra. Al regreso, García Colón pidió detenerse en una tienda de conveniencia para comparar una revista donde su contenido es de damas con poca o ninguna prenda de vestir. No se aclaró si el título era Playboy o Penthouse. Pero tanto la canasta como los productos y la revista fueron llevados y entregados al área de trabajo, lo que generó ese día allí un ambiente de broma y relajo.
A su vez, el apelante fue recriminado por usar el correo de voz (“voice mail”) de la empresa para dejar mensajes en broma y doble sentido. Esto era contrarió a"l¿ política de Cellular One sobre uso del equipo de la empresa.
Con relación a su interacción con la apelada Cuesta, García la invitó a almorzar y ella aceptó en dos o tres ocasiones, ya que eran compañeros de la gerencia en el centro. En otras varias ocasiones, el apelante le pidió transportación a su casa y Madeline Cuesta se la dio luego de ésta preguntarle si a su esposa le parecería bien, a lo cual García le contestó que ella no era celosa. En ese tono de compañerismo informal, para San Valentín, el apelado le regalaba chocolates en forma de corazón. A tono con el mismo sentido, ella-le obsequió a García tres trajes de su esposo los cuales aceptó.
Por su parte, Cuesta se refirió a la persona de García como “espécimen raro” en dos ocasiones. En una de dichas instancias, cuando se hablaba de la virginidad y el matrimonio en la oficina, García expresó que él no había sido infiel a su esposa en ninguna ocasión. En otro día, la apelada le comentó al propio García que siendo tan formal y responsable cualquier mujer podría enamorarse de él.
Los hechos indican que ni García ni Cuesta se invitaron mutuamente a salir, no medió nunca contacto de índole sexual, roces ni otra conducta semejante. Tampoco mediaron proposiciones directas o indirectas de uno al otro para intimar ni tener ningún tipo de relaciones extramaritales. Aun cuando el apelante no tenía el propósito de hostigar a las féminas, su carácter extrovertido le llevaba a dirigirse a muchas como “mi corazón, mi.cielo, .mi estrella”. Esto, aunque no tuviese ningún tipo de familiaridad o conocimiento con las compañeras de Cellular One a quienes le hablaba, fuesen empleados o superiores jerárquicos. En otras ocasiones podía ser sarcástico con las supervisadas al señalarles alguna falla en su desempeño.
El señor García realizó su trabajo en el local de Caguas como supervisor de servicios técnicos con *116 normalidad. No presentó ninguna querella contra Cuesta ni ella contra él por los comentarios expuestos. Más, el apelante le contaba aspectos íntimos de su vida íntima y aspectos familiares a Cuesta a modo de confianza. Así, le contaba de los problemas legales de un hermano, de las situaciones de sus padres y demás. Además, la invitó a una comedia de doble sentido a efectuarse por él en un club.
Sin embargo, el 24 de septiembre de 1999, la gerente del centro no se encontraba en la tarde por lo que uno de los dos supervisores debía permanecer en el local hasta el cierre. García deseaba marcharse temprano ese viernes, pero el esposo de Cuesta sufrió un accidente lo cual requirió de su presencia para llevarle unos documentos y se excusó de sus servicios laborales de ese día. García estuvo renuente a quedarse en la oficina, razón por la cual le refirió su sentir a la gerente mediante un mensaje de voz y se fue. El lunes siguiente, la parte apelada Carmen Cuevas, supervisora del apelado, convocó una reunión con el propósito de evaluar su ausencia y le llamó la atención por su actuación. A falta de existir un procedimiento para cubrir la ausencia no aprobada, Cuevas estableció uno. García entendía que se estaba favoreciendo a Cuesta sobre él y que ello obedecía a que Cuevas y la Directora de Personal, por ser mujeres, protegían aquéllas de su mismo género.
Con posterioridad a la reunión, es decir, una vez fue amonestado por su ausencia no aprobada y su consecuente falta de consideración hacia demás compañeros de trabajo, el apelante le señaló a Cuevas que había sido hostigado sexualmente por Cuesta. A este punto, ya Cuesta se había quejado verbalmente ante Cuevas de los incidentes según alegadamente cometidos por García. Con anterioridad a esto, para mayo de 1999, García se quejó ante Nydia Vélez, psicóloga industrial de la compañía apelada, que Cuevas tenía favoritismo con Cuesta y que le concedía peticiones y solicitudes laborables que a él se las negaban, tales como vacaciones y demás.
Cuando García se quejó de hostigamiento sexual, Vélez refirió el asunto a la Directora de Personal, Carmen Yulín Cruz. A renglón seguido, se le pidió al apelante que redujera su reclamo a escrito sobre los alegados hechos; se le convocó a varias reuniones donde en presencia de David Guerra, gerente regional del área de trabajo del apelado, Nydia Vélez y la propia Directora, dio la versión de los hechos. Se llamó también a Cuesta e incluso se le preguntó a otros compañeros de trabajo sobre los hechos ante los cuales dieron su versión cónsona con la de la apelada. Las entrevistas se extendieron por varios días.
Así las cosas, el 1 de octubre de 1999, García volvió a ser convocado ante la Directora de Personal; David Guerra y la psicóloga industrial Vélez. El resultado de la investigación reveló que el apelante era el que presentaba una conducta inaceptable. Así pues, preparó la carta de despedido de éste y se le informó sobre la misma. El apelante reaccionó de manera nerviosa, estallando en llanto y pidiendo que lo cesantearan para ir a desempleo. La parte apelada Guerra intervino para que la sanción no fuese el despido, ya que refirió conocer los problemas familiares de García como la necesidad de tratamiento médico de su hijo, y las dificultades de aprendizaje de la hija aquejada de un leve retraso mental. Durante la reunión y en medio de la crisis nerviosa sufrida por García, éste redactó junto a la psicóloga Vélez una carta solicitando disculpas a Cuevas por lo ocurrido. Dicha misiva fue firmada por el propio García y enviada a la apelada. Se resolvió entonces suspender por cuatro días, esto es del 4 al 8 de octubre de 1999 a García en cuanto a empleo y sueldo. La empresa determinó que, como no era apropiado que volviesen a trabajar juntos, el apelante fue trasladado al Centro de Reparaciones de Cellular One ubicado en el Municipio de Cataño, en calidad de técnico de reparaciones. Asimismo, se le dejó sin efecto un aumento de salario por mérito. No obstante, García solicitó reconsideración de dichas determinaciones ante la empresa, por lo que se le concedió el aumento retroactivo al 1 de septiembre de 1999.
La decisión de la directora del Departamento de Recursos Humanos de Cellular One, la parte apelada Carmen Yulín Cruz, había-sido-ofrecer lo dispuesto en el Manual de la empresa apelada correspondiente a las sanciones disciplinarias. Tras la investigación, Cruz concluyó que la conducta de García no había sido apropiada y había incomodado a Cuesta. A tenor con las normas de la compañía, la conducta de naturaleza sexual que diese paso a un ambiente hostil intimidante u ofensivo en el empleo era causa suficiente para el *117 despido del causante. Sin embargo, en esta ocasión, no se le aplicó la sanción de despido por la oportuna intervención de Guerra.
El apelante se vio afectado por el cierre de operaciones de la empresa en el Municipio de Cataño. Sin embargo, él y otros quince empleados fueron reubicados en otros puestos. Al reabrirse el Centro, García regresó a las mismas desde la Calle Ortegón en el Municipio de Guaynabo. El apelante también solicitó una plaza de supervisor en Ortegón. El 3 de junio de 2000, la plaza que pidió era la de Supervisor de Servicios al Cliente y fue entrevistado por Luisa Rodríguez y Germán Zapata. García poseía la experiencia dentro de la compañía para ser nombrado. Empero, después de entrevistarlo, los supervisores se decidieron por Aida Vélez, una persona ya empleada de la empresa, quien tenía entre tres y cuatro años de servicio en el Centro Ortegón, aunque de dichos años, sólo había trabajado uno como supervisora. Para Zapata y Rodríguez, García no era la persona apropiada para el puesto, ya que su historial laboral reflejaba dificultades con sus pares debido a su carácter, por sus bromas y el lenguaje que utilizaba. A juicio de los supervisores, él no era la persona idónea para tratar con el público y los asociados ya que no iba a contar con el apoyo de ellos en la consecución de sus tareas. Ninguno de los dos había sido informado de los tropiezos en la tienda ubicada en el Municipio de Caguas ni del alegado hostigamiento al momento de tomar la decisión.
Cuando se le comunicó a la Directora de Personal en funciones, la psicóloga Vélez el resultado de la entrevista, ya García había presentado una queja por discrimen ante el Departamento del Trabajo y Recursos Humanos del Estado Libre Asociado y a eso obedeció el pedido de Vélez. Entre las personas que tuvieron quejas por la conducta de García, se encontraba la que recibió el puesto. Conforme el sentir de Zapata, el apelante era un potencial creador de problemas, lo que les llevó a escoger a una persona a la cual habían visto desempeñarse bien consistentemente, aun cuando no contaba con los tres años de experiencia que requería el aludido manual. Además, se tomó en consideración que la candidata seleccionada no solamente contaba con la capacidad de resolver los conflictos que surgieran sobre la marcha, sino que tenía el respaldo de sus demás compañeros dentro de la empresa. Cabe señalar que los entrevistadores cumplieron con la salvedad de indicarle a García durante la entrevista del 18 de julio de 2000 que la plaza solicitada devengaba un sueldo menor al que tenía el apelante.
El 30 de agosto de 2000, suscitada la renuncia de Cuesta al puesto de supervisora de servicios, García solicitó la plaza vacante. Entre los requisitos de esa plaza de supervisión estaba poseer un bachillerato universitario, requisito obviado en el caso del puesto de supervisión de servicios técnicos que ocupó García y también para la entrevista en Ortegón. El apelante fue entrevistado por Cuevas, Guerra y Mildred Flores, siendo escogida Wilma Cruz, una especialista en la sección de servicios al cliente de las instalaciones empresariales ubicadas en el Municipio de Caguas. Se consideró que como las labores conocidas en servicios técnicos y servicio al cliente son puestos distintos, Cruz era la más cualificada por sus años de experiencia. Ella no reunía el requisito de dos años en un puesto antes de pedir dicho ascenso, pero dicho requisito también podía ser eximido por la Oficina de Personal. Así, de los tres candidatos, se le seleccionó a ella.
Según el criterio de Guerra, García no funcionaba bien bajo presión; durante la entrevista había fallado en responder como resolver situaciones técnicas en conflicto. Surge también que García había criticado a la supervisora y gerente del centro ubicado en el Municipio de Caguas, por lo que resultó obvio concluir que no iba a tener una relación de trabajo armoniosa con la supervisora inmediata de haber sido seleccionado por el panel que lo entrevistó. De igual modo, el señor Guerra había presenciado la crisis nerviosa experimentada por García durante la investigación de su queja en contra de Cuesta.
García calificó como discriminatoria la selección de otros compañeros a las dos plazas para las cuales acudió a entrevista. Consideró' también que de continuar allí se iba a afectar emocionalmente, por lo que presentó su renuncia a su empleo, efectiva el 31 de octubre de 2000. Al cabo de aproximadamente un mes de ello, obtuvo un puesto de trabajo en otra compañía en el departamento de ventas, donde aparenta haber *118 prosperado. Aún así, el salario y los beneficios marginales de Cellular One resultaban ser superiores a los que recibía en su nuevo trabajo. Debido a ello, su esposa, Mildred Valentín, se vio obligada a irse a trabajar a tiempo parcial.
García requirió la ayuda profesional desde el 22 de diciembre de 1999 hasta marzo de 2000 en manos de la psicóloga Elvira Giambartolomei, con el propósito de superar la depresión que le causó sus problemas en el trabajo. Con posterioridad a dicho tratamiento fue tratado por el Dr. Rodríguez Vélez, médico psiquiatra. De los documentos no surge expediente médico alguno de García, aunque sí surgen declaraciones de los peritos que lo examinaron dando fe de sus hallazgos y conclusiones médicas.
Cellular One contaba con una política oficial sobre el hostigamiento en el empleo. Además había cumplido con comunicarle a todo su personal el proceso y pasos a seguir para presentar la correspondiente querella, a discreción del empleado quejoso. Cuando advino el patrono en conocimiento de la queja de García, se siguieron los procesos investigativos ya establecidos. Tanto García como Cuesta conocían la política sobre el particular; García recibió un documento detallando la política y el proceso en estos casos.
De otro modo, y en lo relativo al incidente de la revista pornográfica que el apelante llevó al trabajo, Cuesta también fue amonestada al no impedir tal acción, y García, responsable de introducir la susodicha revista fue disciplinado por la conducta en general sin especificar que era por la revista que adquirió para su compañero de trabajo Pacheco.
Cuando Manuel García no fue seleccionado para ocupar el puesto de supervisor en Guaynabo, se quejó de discrimen en su contra. Esto motivó a la Oficina de Recursos Humanos a realizar una investigación preguntando a los entrevistadores las razones por las cuales no fue seleccionado. Oportunamente, se le comunicó no haber encontrado base a dicho planteamiento. Al mismo tiempo, García indagaba los pormenores exactos del proceso de selección, llamando directamente a los supervisores y a otras personas a las cuales les cuestionaba la elección de otros candidatos sobre él.
Fue por ello que el 10 de octubre de 2000, García presentó una querella formal contra los aquí apelados mediante la cual reclamó haber sido víctima de hostigamiento sexual y discrimen por sexo por parte de su compañera de trabajo, Cuesta, quien ostentaba un puesto de trabajo idéntico al del apelante. Dicha acción fue presentada inicialmente al amparo del procedimiento sumario que establece la Ley Núm. 2 de 17 de octubre de 1961, según enmendada.
Alega el apelante que, mientras laboraba en Cellular One, fue objeto de trato desigual y represaba por motivo de haber presentado una queja de hostigamiento sexual contra Cuevas y por haber presentado una querella ante la Unidad de Antidiscrimen del Departamento del Trabajo y Recursos Humanos (en adelante, “UAD”). El apelante formuló que los apelados lo suspendieron, degradaron en su puesto y lo trasladaron después de presentar su queja de hostigamiento sexual ante dicho patrono. Además, reportó que en la empresa apelada lo privaron de oportunidades de ascenso para favorecer a personas del sexo opuesto y que las supuestas condiciones onerosas de empleo impuestas por su patrono lo forzaron a renunciar a su puesto. Como resultado de ello, el apelante solicitó la reinstalación, salarios dejados de devengar y daños y perjuicios por las angustias y sufrimientos mentales y morales sufridos como consecuencia de los supuestos actos cometidos por los apelados.
El 21 de abril de 2001, la parte apelante presentó demanda enmendada para incluir una acción bajo la Ley Núm. 115 de 20 de noviembre de 1991, según enmendada, bajo la causal de represalia que acotó haber sufrido por parte de su patrono como consecuencia de haber presentado la querella ante la UAD. Así las cosas, en o alrededor del 29 de junio de 2001, los apelados contestaron la demanda enmendada negando haber incurrido en actos de represaba contra el apelante y levantaron como defensa afirmativa que no estaban presente los elementos de una reclamación por discrimen, hostigamiento y despido constructivo. Como resultado de las *119 enmiendas a la demanda, el TPI convirtió el procedimiento sumario en uno ordinario y utilizó los mecanismos que provee el procedimiento ordinario para tramitar el caso.
El 23 de diciembre de 2002, el TPI dictó resolución denegando una solicitud de sentencia sumaria presentada por la parte apelada al concluir que existía controversia de hechos, particularmente sobre el ambiente de trabajo que supuestamente imperaba en la empresa, incluyendo el hecho de si la privación de oportunidades de ascenso fue motivada por razones discriminatorias.
Tras varios trámites procesales, el-TPI concluyó que la conducta de suspender, trasladar y denegar al apelante las plazas solicitadas estuvo debidamente justificada porque el apelante quejoso de hostigamiento sexual fue quien incurrió en la conducta prohibida. Además, concluyó que los apelados no incurrieron en represalia al privar de ascenso al apelante porque no conocían de las querellas presentadas por el apelante y porque existían razones justificadas para seleccionar a personas del sexo opuesto.
Insatisfecho con el curso decisorio de referencia, el apelante recurre ante nos imputándole al TPI la comisión de lo siguiente, lo cual desglosó en cuatro errores de derecho. En síntesis, el apelante nos trae a colación que el TPI no debió concluir: 1) que la conducta de los apelados estuvo justificada por entender que el querellante incurrió en conducta constitutiva de hostigamiento sexual; 2) que los apelados desconocían de las querellas presentadas por el apelante ante la empresa y ante la UAD al momento de privarlo de oportunidades de ascenso; 3) que la apelada tenía justificación para privar de oportunidades de ascenso al apelante y concederle estos puestos a personas del sexo opuesto con menos experiencia y quienes no cumplían con los requisitos de antigüedad requeridos por las convocatorias de los puestos; y 4) que el apelante fue discriminado y despedido por razón de su sexo.
Con el beneficio de una exposición narrativa de la prueba, la comparecencia de las partes y el derecho aplicable, confirmamos la sentencia apelada.
II
Por estar íntimamente vinculados, discutiremos en conjunto los errores señalados.
Refiere el apelante que como consecuencia de las conductas imputadas ya descritas, la apelada Cuevas solamente fue amonestada verbalmente, mientras que él sufrió una suspensión, traslado y degradación del puesto que ocupaba en la empresa. Ante ello, el apelante levanta su convicción de que dicho alegado trato desigual responde a su género masculino, distinto a aquellos que investigaron y supervisaron su caso y distinto, a su vez, a aquellas personas a quienes se le ofrecieron los ascensos solicitados por el apelante. García insiste que el patrono lo castigó por presentar su queja contra una empleada mujer, lo tildó de “troublemaker en potencia” y lo privó de oportunidades de ascenso, todo en señal de represaba ante su participación en una actividad protegida, obligándolo a renunciar por sentirse amenazado dentro de la empresa. No le asiste la razón. Exponemos al respecto.
III
A. La apreciación de la prueba y la adjudicación de credibilidad
Es norma claramente establecida por el Tribunal Supremo de Puerto Rico que en ausencia de error manifiesto, pasión, prejuicio o parcialidad, no se intervendrá a nivel apelativo con las determinaciones de hechos y adjudicación de credibilidad hecha en instancia por el juzgador de los hechos. Trinidad García v. Chade, 2001 J.T.S. 10; Colón y otros v. K-Mart y otros, 2001 J.T.S. 98; Municipio de Ponce v. Autoridad de Carreteras, 2001 J.T.S. 3; Monitor Arzola v. Soc. Legal de Gananciales, 138 D.P.R. 600 (1995)
*120 Más aún, dispone la Regla 43.2 de las de Procedimiento Civil de Puerto Rico, 32 L.P.R.A., Ap. DI, en lo pertinente, que “[l]as determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el Tribunal Sentenciador para juzgar la credibilidad de los testigos”.
Un foro apelativo no puede descartar y sustituir por sus propias apreciaciones, basadas en un examen del expediente del caso, las determinaciones tajantes y ponderadas del foro de instancia. Argüello v. Argüello, supra. La determinación de credibilidad del tribunal sentenciador es merecedora de gran deferencia por parte del tribunal apelativo por cuanto es ese juzgador quien, de ordinario, está en mejor posición para aquilatar la prueba testifical desfilada, ya que él fue quien oyó y vio declarar a los testigos. íd.\ Pueblo v. Bonilla Romero, 120 D.P.R. 92 (1987).
Más aún, el juez ante quien deponen los testigos es quien tiene la oportunidad de verlos y observar su manera de declarar, de poder apreciar sus gestos, titubeos, contradicciones, en fin, el comportamiento general mientras declara, factores que van formando gradualmente en su conciencia la convicción en cuanto a si dicen la verdad. Argüello v. Argüello, supra. “[L]a declaración de un testigo no contradicho sobre un hecho determinado, debe merecer crédito, a no ser que su versión sea físicamente imposible, inverosímil o que por su conducta en la silla testifical se haga indigno de crédito". Miranda Soto v. Mena Eró, 109 D.P.R. 473 (1980) (Citas omitidas).
Aunque, de ordinario, el foro apelativo no interviene con la apreciación de la prueba que hacen los foros judiciales de instancia, sí lo hace cuando un balance racional, justiciero y jurídico de la totalidad de la prueba y de los documentos que obran en autos lleva a conclusiones distintas a las del tribunal de instancia. Negrón Rivera y Bonilla, Ex Parte, 120 D.P.R. 61 (1987).
Un tribunal apelativo no puede dejar sin efecto una sentencia cuyas conclusiones encuentran apoyo en la prueba desfilada. Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 172, 181 (1985); Pérez v. Hosp. La Concepción, 115 D.P.R. 721, 728 (1984). No obstante, está claro que el arbitrio del juzgador de hechos es respetable, mas no absoluto. Por eso, una apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora de un tribunal apelativo. Véase, Rivera Pérez v. Cruz Corchado, 119 D.P.R. 8 (1987).
No obstante, en el ejercicio de su facultad revisora, el foro apelativo se encuentra en igual posición que el foro de primera instancia en cuanto a evaluar la prueba pericial y documental ofrecida. Es por ello que, en lo que respecta a dicha evidencia, está facultado a adoptar su propio criterio en la evaluación de la misma. En cuanto a la prueba pericial, el Tribunal Supremo ha expresado que como foro apelativo, no estamos obligados a seguir indefectiblemente “la opinión, juicio, conclusión o determinación de un perito o facultativo...y que todo tribunal está en plena libertad de adoptar su criterio propio en la apreciación y evaluación de la prueba”. Culebra Enterprises Corp. v. E.L.A., 143 D.P.R. 935 (1997), citando & Prieto v. Maryland Casualty Co., 98 D. P.R. 594 (1970) (otras citas omitidas); Véase, además, Dye-Tex Puerto Rico, Inc. v. Royal Insurance Company of Puerto Rico, 150 D.P.R. 658, 662-663 (2000).
Habiendo discutido lo relativo a la apreciación de la prueba y la adjudicación de credibilidad alrededor de la cual se circunscriben los planteamientos que hoy nos ocupan, pasemos a entrar a los pormenores de los errores planteados a la luz de la discusión que antecede.
La querella inicial, cuya adjudicación se hace a través de la sentencia aquí apelada, se instó bajo diversas leyes. En general, todos los reclamos corresponden al alegado hostigamiento sexual contra el Sr. García y las supuestas represalias del patrono por haberse quejado de los actos atribuibles a la compañera de éste.
*121 B. El Hostigamiento Sexual
La Constitución del Estado Libre Asociado en su Carta de Derechos, Art. II, Sec. 1, 1 L.P.R.A., establece que la dignidad del ser humano es inviolable y que todas las personas son iguales ante la ley. Se consagra como principio fundamental, el derecho de toda persona a la protección contra ataques abusivos a su honra, reputación y vida privada o familiar. Art. II, Sec. 8, supra; Afanador Irizarry v. Roger Electric, 2002 J.T.S. 62.
Para poner en vigor dicho mandato constitucional, se ha legislado para proveer a los empleados los recursos necesarios para protegerlos de prácticas discriminatorias en el empleo entre la que se encuentra la Ley Núm. 17 de 22 de abril de 1988, 29 L.P.R.A. 155 et. seq., según enmendada, la cual, como parte de su política pública, prohíbe el hostigamiento sexual en el empleo e impone penalidades a quienes cometan o permitan tal conducta. La Exposición de Motivos de dicha ley establece que “[l]a práctica del hostigamiento sexual en el empleo, en cualquiera de sus formas, infringe la inviolabilidad del ser humano y constituye un claro discrimen contra el hombre o la mujer en el campo del trabajo. ’’
La Asamblea Legislativa en el artículo 3 de la Ley Núm. 17, supra, define el hostigamiento sexual en el empleo como cualquier acercamiento sexual no deseado, requerimiento de formas sexuales y cualquier otra conducta sexual verbal o física. Puede ser dicha conducta de forma implícita o explícita. Dicha conducta describe de la siguiente manera, es decir, cuando se da una o más de las circunstancias siguientes:

“(a) Cuando el someterse a dicha conducta se convierte de forma implícita o explícita en un término o condición del empleo de una persona.

(b) Cuando el sometimiento o rechazo a dicha conducta por parte de la persona se convierte en fundamento para la toma de decisiones en el empleo o respecto del empleo que afectan a esa persona.

(c) Cuando esa conducta tiene el efecto o propósito de interferir de manera irrazonable con el desempeño del trabajo de esa persona o cuando crea un ambiente de trabajo intimidante, hostil u ofensivo. ”

29 L.P.R.A. sec. 155b.
Los incisos (a) y (b) de este artículo se refieren al tipo de hostigamiento sexual quid pro quo (algo a cambio de algo). En la modalidad quid pro quo, los patronos condicionan las oportunidades y los beneficios del empleado a cambio de favores sexuales.
El inciso (c) se refiere al hostigamiento sexual que cree un ambiente hostil o intimadamente. En esta modalidad, el empleado, independientemente de la posición que ocupa en el empleo, trabaja en un ambiente ofensivo o abusivo. En otras palabras, cualquier empleado, sin importar la clasificación y puesto jerárquico que ocupe en el lugar de empleo, puede crear un ambiente hostil. Ellison v. Brady, 924 F 2d. 872 (9no Cir. 1991). Delgado Zayas v. Hosp. Int. Med. Avanzada, 137 D.P.R. 643 (1994).
En lo que nos atañe, el ambiente hostil es producido cuando la conducta sexual para con un individuo tiene el efecto de interferir irrazonablemente con el desempeño de su trabajo o de crear en el mismo un ambiente intimidante, hostil u ofensivo. Rodríguez v. Supermercado Amigo, supra. Es deber de los tribunales examinar si la alegada conducta es lo suficientemente severa y ofensiva como para alterar las condiciones del empleo o crear un ambiente de trabajo abusivo. No se requiere que dicha conducta produzca un daño económico y que sea de naturaleza explícitamente sexual. Afanador Irizarry v. Roger Electric, supra. La ley en contra de esta conducta requiere que este examen se realice de acuerdo a la totalidad de las circunstancias de cada caso en particular. Art. 4, supra, 29 L.P.R.A. sec. 155(c). Véase además, Delgado Zayas v. Hospital, 137 D.P.R. 643, 653 (1994).
*122 Por su parte, la ley dispone que el patrono tiene la responsabilidad absoluta de sus actos y los de sus supervisores y agentes, independientemente del conocimiento del hostigamiento o de que haya prohibido el mismo. Art. 5, supra, 29 L.P.R.A. sec. 155d. Por tanto, del estatuto se abstrae un deber por parte del patrono de garantizar la prevención, prohibición y erradicación del hostigamiento sexual en el empleo.
Sobre el particular, el Art. 10 de la Ley Núm. 17, supra, le exige al patrono que exponga de una manera clara su política contra el hostigamiento sexual entre sus supervisores y empleados; así se asegura de garantizar la protección de la dignidad y que el ambiente en el lugar de empleo sea seguro. Para cumplir con la obligación de prevenir, desalentar y evitar el hostigamiento sexual en el empleo, el estatuto le impone al patrono el deber de mantener el lugar de trabajo libre de intimidaciones y hostigamiento. Entre las medidas que el patrono tiene derecho a tomar para salvaguardar las garantías de referencia, se encuentran, entre otras y sin limitarse a las mismas, las siguientes:

“(a) Expresar claramente a sus supervisores y empleados que el patrono tiene una política enérgica contra el hostigamiento sexual en el empleo.

(b) Poner en práctica los métodos necesarios para crear conciencia y dar a conocer la prohibición del hostigamiento sexual en el empleo.

(c) Dar suficiente publicidad en el lugar de trabajo, para los aspirantes a empleo, de los derechos y protección que se les confieren y otorgan bajo las sees. 155 a 1551 de este título, al amparo de las secs. I[3j21 a 1341 de este título, las sees. 146 a 151 de este título y de la Constitución del Estado Libre Asociado de Puerto Rico.

(d) Establecer un procedimiento interno adecuado y efectivo para atender querellas de hostigamiento sexual. ”

29 L.P.R.A. sec. 155L Véase, además, Delgado Zayas v. Hosp. Int. Med. Avanzada, supra. Ciertamente, el patrono tiene pleno derecho a hacer valer su política de hostigamiento sexual mediante las debidas sanciones a aquellos empleados que violan tal política. íd.
Cónsono con tales principios, se ha reconocido que el hostigamiento sexual en el empleo, constituye una modalidad de discrimen por razón de sexo. Rodríguez v. Supermercado Amigo, 126 D.P.R. 117, 124 (1990); In re: Robles Sanabria, 2000 J.T.S. 106.
El hostigamiento sexual puede expresarse en diversas formas: 1) manifestaciones simples como piropos, guiñadas e insinuaciones sexuales indeseadas; 2) expresiones de agresión sexual más directas y más violentas como frases de cariño no invitadas, pellizcos, roces corporales no solicitados, invitaciones insistentes a salidas que no se desean, besos, abrazos y apretones forzados; 3) casos extremos de violencia física y psíquica, que incluye la violación sexual. Sánchez v. A.E.E., 142 D.P.R. 880 (1997).
IV
De un análisis de las controversias planteadas, se refleja que las mismas están vinculadas a elementos subjetivos, de intención, propósitos mentales o factores de credibilidad. Ante ello, no cabe lugar a duda que los testimonios vertidos por las partes durante el juicio confirman que fue el apelante quien incurrió en una conducta de hostigamiento sexual. Podemos, pues, colegir, en común concierto con la apreciación y determinación consecuente según emitida por el TPI, que los errores imputados no fueron cometidos. Veamos porqué en detalle.
A
En primer lugar, el apelante acostumbraba en su área de trabajo, frente a los demás empleados quienes eran, a *123 su vez, sus supervisados, a solicitarle a la alegada hostigadora, Cuesta, utilizando un acento español, a que modelara, diciéndole, entre otros comentarios, “Maja, entre y modele”. Dicho comentario fue admitido en evidencia mediante el propio testimonio del apelante. García admitió, también, que dicha conducta podría ser considerada como hostigamiento sexual. El apelante aceptó mediante su testimonio en juicio que lo amonestaron por dirigirse de manera sarcástica a una compañera de trabajo.
En segundo lugar, el apelante reconoció que fue amonestado por haberse dirigido de manera sarcástica en varias ocasiones hacia otra de sus compañeras, lo que provocó otra amonestación por escrito en mayo de 1999; ocho días después hizo una queja con la psicóloga industrial Vélez. Más aún, el apelante confirió que su comentario de decirle a Cuesta, “aquí apesta a huevo porque todos somos hombres” podría ser considerado ofensivo y una expresión de doble sentido.
La conducta hostigadora del apelante incluye, entre otras instancias, el haber comprado una revista pornográfica al área de trabajo. García admitió durante el juicio que fue suya la idea de comprar una revista para el empleado Pacheco quien se marchaba de la empresa justificando su ejecutoria a que dicho empelado era hombre soltero y podía tener uso para la misma. Como admitió haber hecho los referidos comentarios y su carácter altamente ofensivo e insinuante dentro de su ambiente de trabajo, así admitió otras manifestaciones ya referidas hechas a Cuesta en contra de la anuencia y voluntad de ésta, tales como su alegada práctica de lavarle el clitoris a la hija menor de edad de García, a decirle que se sacaba las cejas y se rasuraba todo el cuerpo porque era una fantasía sexual de su esposa, hasta dejai' mensajes grabados de doble sentido en el sistema central de mensajes de la empresa.
El TPI encontró probado que el apelante hacía comentarios subidos de tono frente a compañeros de la gerencia; que era propenso a hacer comentarios ligeros y bromas; que le pedía a Cuesta que modelara cuando la veía llegar y lo hacía frente a los técnicos para disfrutar de la belleza de la apelada. Sobretodo, la parte apelante, -durante el juicio, -renunció -a su reclamación por hostigamiento sexual, y admitió que sus actuaciones no habían sido adecuadas. Concurrimos, a su vez, con la apreciación por parte del tribunal apelado en torno a haber encontrado probado que los comentarios a una mujer: 1) que el olor a huevos se debe a la presencia de hombres; 2) las peticiones de modelar frente a los compañeros masculinos para disfrutar de la belleza; 3) la entrega de revistas pornográficas en el lugar de empleo; 4) el referir las fantasías sexuales de la esposa; y 5) el lavado de clitoris, son reactores suficientes para justificar que el creador del ambiente hostil sexual fue el apelante.
Ante dichas expresiones, el patrono actuó correctamente al disciplinar al apelante por haber incurrido en conducta constitutiva de hostigamiento sexual; la actuación de dicho patrono responde a su ineludible deber de cumplir con ofrecer las garantías que el estatuto le obliga en aras de proteger a sus empleados y evitar que situaciones como la que nos ocupan se susciten. Según el testimonio vertido por la supervisora Carmen Cruz, estamos de acuerdo que la conducta desplegada por García hacia Cuesta no era cónsona y rompía la política de hostigamiento sexual de la compañía. Siendo García un supervisor quien abiertamente admitió haber recibido la política de hostigamiento sexual, su manejo y demás procedimientos y consecuencias, representa una consecuencia de mayor envergadura. Es decir, él sabía lo que implicaba conducta aceptable versus conducta ofensiva, y su deber, también ineludible, era reconocer lo importante que era para la empresa apelada la referida política y los mecanismos para prohibir dicha conducta.
B
En cuanto a la reclamación de represaba por parte del patrono hacia la persona del apelante, tenemos que decir lo siguiente, abonando, claro está, a nuestra firme convicción de que García incurrió en conducta la cual indiscutiblemente infringió los postulados relativos al ordenamiento jurídico y la política en contra del hostigamiento sexual en el empleo.
La parte apelante basa su reclamación en que el apelante presentó una querella ante la UAD y que fue privado *124 subsiguientemente de oportunidades de ascenso y que el patrono apelado no presentó razón legítima y no discriminatoria para privar al apelante de dichas oportunidades. Contrario a ello, entendemos, al igual que los apelados, que la prueba testifical y documental desfilada durante el juicio demostró que hubo razones legítimas y de peso para justificar las acciones del patrono y que la compañía hubiera actuado de igual manera estando ausente la queja del apelante ante la UAD. Lejos de vislumbrarse como actuaciones típicas de represaba o desquite por parte del patrono, sencillamente el apelante no estaba cualificado para ocupar las plazas solicitadas.
El apelante admitió haber emitido la serie de comentarios cuyo efecto fue crear el ambiente hostil sufrido por la apelada Cuevas. La prueba desfilada durante el juicio evidenció que para las plazas solicitadas por el apelante era necesario que se cumplieran con una serie de requisitos, entre ellos, haber ocupado por lo menos dos años en la posición en que se encontraba y tener un bachillerato. García conocía las normas de la compañía en cuanto a los requisitos para plazas, solicitudes de traslados y para ocupar otros puestos.
García admitió que existe una política en la empresa que cualquier aspirante a un traslado a otro puesto debe cumplir por lo menos un año en la puesto antes de solicitarlo. El apelante admitió que solicitó la plaza de supervisor en una de las dependencias de Cellular One en el Municipio de Guaynabo. García admitió que no llevaba todavía un año en la plaza que ocupaba como técnico de reparaciones en el Municipio de Cataño. García también aceptó que tampoco llevaba un año en su plaza cuando solicitó el puesto de Supervisor en otra de las dependencias de la empresa ubicada en el Municipio de Caguas. El apelante aceptó que esta plaza también requería un bachillerato, lo cual él no tenía.
Durante el proceso de contratación y búsqueda de una persona para ocupar las plazas solicitadas por el apelante, éste fue entrevistado por cuatro supervisores distintos. Una vez terminado el proceso que, a toda luz, es riguroso, quedó demostrado que el apelante no era el mejor candidato para ocupar la plaza vacante.
De acuerdo al testimonio vertido por uno de los entrevistadores, el señor Zapata,-de una serie de preguntas-formuladas para crear un ambiente simulando una potencial situación laboral con un cliente como parte de la entrevista, García no completó acertadamente la tarea asignada e incidió en no ofrecer soluciones razonables. En cambio, quedó demostrado que la persona seleccionada para el puesto tenía la preparación, cumplía con los requisitos y tenía el apoyo de los asociados.
Finalmente, Zapata acotó que los criterios de selección utilizados para cubrir dicha plaza, en nada respondían y eran totalmente independientes a la querella que, previa a la entrevista, presentara García ante la empresa. Sencillamente, el apelante no cumplía con los requisitos exigidos en el manual de empleados sobre dicho puesto. Valga resaltar que los entrevistadores coincidieron que la falta de cumplimiento con los requisitos exigidos por la plaza solicitada contribuyó desfavorablemente para García. Sus testimonios coinciden en que el expediente personal de García dentro de la empresa, el cual recoge las diversas amonestaciones e incidentes suscitados por los actos no protegidos del apelante, quedó demostrado un patrón de relaciones interpersonales atípicas con sus compañeros de trabajo, factor que tampoco lo hizo viable ni apto para ocupar la plaza de supervisor de muchos de esos mismos colegas.
El marco referencial precedentemente expuesto inclina nuestra balanza a reafirmar la apreciación del TPI, concluyendo, pues, la inexistencia de discrimen por razón de sexo en su vertiente de represalia instada por el apelante contra la corporación Cellular One. Veamos.
De la Ley Núm. 115, supra, surge una presunción de represalias cuando el empleado prueba: 1) que ofreció o intentó ofrecer cualquier testimonio, expresión o información no difamatoria o confidencial ante un foro legislativo, administrativo o judicial, y 2) que subsiguientemente fue despedido, amenazado o discriminado con relación a las condiciones de empleo. 29 L.P.R.A. 194a (c); Hernández v. Espinosa, 145 D.P.R. 248 (1998); Marín v. Fastening Systems, Inc., 142 D.P.R. 499 (1997).
*125 Los hechos y testimonios vertidos demuestran que el panel entrevistador desconocía de la querella presentada por García ante la UAD, por lo que la misma no fue un factor determinante al momento de escoger a otra persona a ocupar las plazas por él solicitadas. Reiteramos nuestra conclusión de que existían personas con mejor preparación y experiencia para ocupar las mismas.
En cuanto a la contención del apelante sobre las condiciones onerosas impuestas por el patrono para obligarlo a renunciar, alegada razón por lo cual se debió concluir que García fue discriminado y despedido por razón de sexo, no cuenta con nuestro aval.
Para disponer de estos dos planteamientos; basta con indicar que de los documentos auscultados no vislumbramos ni percibimos la existencia de condiciones onerosas en el empleo que obhgaran a García a renunciar. Todo lo contrario, el apelante se proyectaba y conducía tan a gusto en su trabajo que hasta ascensos solicitó dentro de la propia empresa; lo contrario hubiese dictado movimientos en el sentido opuesto, es decir, actos afirmativos y conspicuos para irse de la compañía apelada.
Por su parte, quedó vertido mediante el propio testimonio del apelante que, durante el acto del juicio, renunció expresamente a su reclamación de discrimen por razón de sexo y hostigamiento. El apelante tuvo ante sí el foro apropiado para presentar su queja libremente en la empresa, la cual fue atendida oportunamente, se investigó exhaustivamente por varios miembros del personal del Departamento de Recursos Humanos de la empresa, investigación que se extendió por varios días. Contrario a lo alegado por la supuesta víctima, esto es, García, acabó convirtiéndolo en victimario, al concluir la detallada investigación siguiendo rigurosamente los postulados de la empresa y las exigencias de la ley, según el testimonio vertido por la señora Cruz.
Del testimonio de García se desprende admisión de su reconocimiento sobre el resultado de la investigación y que, a raíz de la queja que provocó el detallado proceso investigativo, la empresa determinó que fue él quien incurrió en hostigamiento sexual. Vale enfatizar que, como parte de las recomendaciones, se favorecía la cesantía del empleado apelante; las instancias reseñadas, en conjunción con su conocimiento previo de la seriedad y consecuencia de las mismas lo hacían merecedor de dicha determinación ponderada. Sin embargo, García reconoce la intervención del supervisor de área del apelante, el apelado señor Guerra, para que solamente se le diera una suspensión y remoción del área de trabajo, ya que Cuevas y García, definitivamente, no podían trabajar juntos, de acuerdo a la política de la compañía en casos de dicha índole.
Por último, el apelante renunció a su trabajo por voluntad propia; incidió el apelante en poner en condiciones a este foro para concluir que el patrono apelado impusiera condiciones de trabajo onerosas las cuales lo obligaran a renunciar, lo cual, a toda luz, llevó a cabo por voluntad propia según vertido en el expediente ante nos, lo que nos obliga a conclub que no se configuró un despido constructivo.
Y como si lo anterior no fuera suficiente para dejar meridianamente claro que la ausencia de un posible despido constructivo, en un momento dado en que el Centro de Reparaciones de Cellular One ubicado en el Municipio de Cataño, donde se encontraba trabajando el apelante cerró, la compañía le dio la oportunidad de seguir trabajando reubicándolo en otro centro de trabajo, lo cual el apelante aceptó. Cuando dicho Centro reabrió, a solicitud expresa del apelante para volver al mismo, su deseo le fue conferido.
Concurrimos con la apreciación del TPI en cuanto a que del testimonio subjetivo de García no se justifica un derecho a la indemnización al amparo de la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, mejor conocida como la “Ley de Indemnización por Despido Injustificado”, 29 L.P.R.A. sec. 185a et seq. La ausencia de fundamentos hace innecesario el desmenuce en su fondo del estatuto de referencia; mucho menos hace necesario interpretar la concesión de dicho derecho de indemnización, según reclamado. Simplemente, el apelante incidió una vez más en demostrar otra de sus contenciones, a saber, que hubo un despido constructivo. Los elementos, según vistos, arrojan hacia el sentido opuesto, por lo que no le ampara dicho derecho.
*126 Recapitulando, ante un minucioso análisis de las controversias presentadas ante nos, no podemos descartar y sustituir por nuestras propias apreciaciones, basadas en un examen del expediente del presente caso, las determinaciones tajantes y bien ponderadas del TPI. Argüello v. Argüello, supra. La determinación de credibilidad del tribunal apelado es merecedora de gran deferencia por este foro; colegimos que fue quien estuvo en mejor posición para aquilatar la prueba testifical desfilada, ya que él fue quien oyó y vio declarar a todos los testigos, incluyendo el testimonio de García. íd.; Pueblo v. Bonilla Romero, supra.
Habiendo el TPI actuado correctamente al concluir que el patrono apelado manejó las particularidades ante sí de acuerdo a la política imperante para dilucidar las mismas, concluimos que los errores no fueron cometidos, por lo que confirmamos la sentencia apelada.
y
En vista de lo anterior, confirmamos la sentencia apelada.
Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.
Leda. Laura M. Vélez Vélez
Secretaria del Tribunal de Apelaciones